## A96A1054. PEAVY et al. v. BANK SOUTH, N.A.
### (474 SE2d 690)

McMurray, Presiding Judge.

Plaintiffs Jerry O. Peavy, Sr. and his wife, Lillie J. Peavy, brought this action for damages against defendant Bank South, N.A. ("the Bank"), alleging that they were customers of the Bank, and that, as an accommodation to his son, "Jerry Otha Peavy, Jr., who did not have a bank account of his own," plaintiff Jerry O. Peavy, Sr. allowed his son to deposit a certain draft "in the amount of $5,323.60 drawn by CNL Insurance America on its account with BANK SOUTH, N.A." This draft was jointly "payable to the order of Jerry Peavy *and* Trust Company Bank[; however, on December 29, 1992,] the draft was [presented and accepted for deposit even though] endorsed only by Jerry Peavy, plaintiff's son." "Notwithstanding these explicit written instructions, . . . BANK SOUTH, N.A. [allegedly] paid the draft to one endorsee only," thereby allegedly acting as both a depository bank and a collecting bank. Plaintiffs, "acting in good faith and believing that the $5,323.60 had been deposited in their account lawfully and properly, and therefore rightfully belonged to their son, wrote checks over the period of January and February 1993 withdrawing the funds and exhausting said amount for the direct benefit of their son, Jerry Otha Peavy, Jr." No one from the Bank contacted plaintiffs until March 30, 1993. At that point, the Bank concluded that the draft had been improperly deposited and reversed the transaction it had made on December 29, 1992, by debiting plaintiff's account and crediting CNL Insurance America's account in the sum of $5,323.60. Also, on or about March 30, 1993, Bank officer Cecil Gordon "telephoned [plaintiffs] and [allegedly] threatened to send them to jail if they did not immediately deposit the sum of $5,323.60 into their account to make up for the amount of the draft [the Bank] had removed from [plaintiffs'] account." Plaintiffs complied with this directive from the Bank, by depositing the proceeds from a previously planned sale of stock. Plaintiffs sought to recover the $5,323.60 they paid into their account as a result of the Bank's alleged conversion and tortious coercion, as well as other unspecified damages and attorney fees.

The Bank admitted the chronology of events and that it "credited the account of plaintiffs with the amount of the draft." On or about March 30, 1993, the Bank "became aware that the draft had been knowingly deposited . . . without the signature of the co-payee. [The Bank] then credited the account of CNL Insurance America in the sum of $5,326.60 . . . and debited the account of Jerry O. Peavy, Sr. by that same amount. . . ." But the Bank denied any conversion of funds, contending that the charge-back was authorized under Article 4 of the "Uniform Commercial Code — Bank Deposits and Collec-

tions," OCGA § 11-4-101 et seq., and also under its deposit account agreement with plaintiffs. The Bank further admitted that Cecil Gordon was its agent attempting to collect a debt from plaintiffs when he insisted that plaintiffs make an immediate deposit, but denied that Cecil Gordon threatened to institute criminal proceedings.

After discovery, the Bank moved for summary judgment, contending that the undisputed facts showed no tortious coercion by the Bank and that plaintiffs cannot recover for their voluntary payment of additional sums paid into their overdrawn checking account. The Bank supported its motion with the deposition of plaintiff Lillie J. Peavy, who affirmed that she gave a deposit slip to her husband's son, who actually endorsed the CNL Insurance America draft and deposited it in plaintiffs' checking account. It was Lillie J. Peavy's understanding that this draft from the insurance company was "to take care of [certain] damage to [Jerry O. Peavy, Jr.'s] car." She confirmed her understanding that Trust Company Bank "ha[d] a lien on the car," but did not know that the insurer's draft was made payable jointly to her stepson and Trust Company Bank. It is undisputed that the draft was never endorsed over as payable to plaintiffs.

Lillie J. Peavy recalled her telephone conversation with someone who "identified himself as Cecil Gordon from Bank South Security. . . . He said . . ., you need to bring fifty-four hundred dollars down to Bank South immediately. I said, I don't have fifty-four hundred dollars. He said, what did you do with the money, Ms. Peavy. I said, I didn't do nothing with no money. He said, do you not know this is a criminal offense. I said, what. Then he explain [sic] to me, you know, that this check from C & L Bank [sic] was returned to Bank South with insufficient endorsement and [he] wanted to know what was my relation to it and I explained to him as far as we knew that money belonged to [Jerry O. Peavy, Jr.] and that he deposited it in our account because he was going back out on the road and when he would ask for money, he would have me write a check for him and I would write a check for whatever he asked for. He said, so you're an innocent party in this. I said, well, yes, I guess so." Lillie J. Peavy confirmed that "Mr. Gordon told [her] or asked [her] don't you know that this is a criminal offense." She also confirmed that, while Cecil Gordon "didn't threaten [her] with prosecution or anything like that[, . . .] the way he was speaking to [her] harshly. It was like — he acted like I was a criminal and like I was going to go to jail or something. He scared [her]." That same day, Mrs. Peavy sold some stock and caused "[a]round ten thousand [dollars]" to be deposited into her checking account, to cover the negative balance. Bank records demonstrated this deposit was actually $8,634.70. Plaintiffs sold that stock intending "to put a down payment on a large truck so [Jerry O.

Peavy, Sr.] could go into the trucking business. The bank had already approved the loan." But Lillie J. Peavy confirmed that her conversation with Cecil Gordon took place "[a]fter [she] had [already] sold the stock." (Emphasis supplied.) Mrs. Peavy further affirmed that the Bank "cover[ed] any checks" that plaintiffs had written on their account. Plaintiffs never sought legal counsel before telling Cecil Gordon that they would make the additional deposit.

The Bank further relied on plaintiffs' deposit contract, which incorporates by reference the Bank's published General Deposit Regulations and accorded the Bank "a security interest in all amounts credited to the Account and in all checks or other items now or in the future delivered to the Bank for collection. . . . The Bank may charge any . . . indebtedness against the Account whenever the Bank believes in good faith that the prospect of payment of such indebtedness is then matured. . . ."

Plaintiffs filed their own cross-motion for partial summary judgment, based on the Bank's alleged breach of warranty and coercion. The trial court granted the Bank's motion for summary judgment; and this appeal followed. *Held*:

1. In their second enumeration, plaintiffs contend that the trial court erred in granting summary judgment as to the claim for tortious coercion, because the Bank's agent, Cecil Gordon, threatened Lillie J. Peavy by asking her if she knew writing bad checks was a criminal offense.

"Duress is shown where there was an apparent intention and ability to execute the threat that would have coerced action or inaction contrary to the victim's will." (Citations and punctuation omitted.) *Fields v. Thompson*, 164 Ga. App. 331, 332 (2), 333 (297 SE2d 100). "It has been frequently held that mere threats of criminal prosecution, where neither warrant has been issued nor proceedings commenced, do not constitute duress. . . . The threatened prosecution must be for an act either criminal or which the party threatened thought was criminal. A mere empty threat does not amount to duress." *Bond v. Kidd*, 1 Ga. App. 798, 801 (57 SE 944).

OCGA § 16-9-20 (a) proscribes the offense of deposit account fraud, including drawing bad checks. There is considerable doubt that a question directed to a bank customer, as to whether that customer knew writing checks drawn against an account with insufficient funds (in exchange for a present consideration or wages) was a criminal offense, constitutes anything more than a truism. Moreover, Lillie J. Peavy conceded that Cecil Gordon never threatened her with prosecution for any criminal offense. There is no evidence that any criminal warrant was ever issued at the behest of the Bank. In our view, any implied threat of prosecution subjectively perceived by Lillie J. Peavy in the case sub judice was a mere empty threat by the

Bank. Consequently, we hold that such a question as was posed to Lillie J. Peavy is not that coercion or duress contemplated by the law as would render the Bank liable to these plaintiffs for reimbursement of the funds they deposited into their overdrawn account allegedly in response to such interrogation. *Yearwood v. Nat. Bank of Athens*, 222 Ga. 709, 712 (152 SE2d 360). The trial court correctly granted summary judgment as to plaintiffs' claim of tortious coercion.

2. In related enumerations, plaintiffs contend the trial court erred in granting summary judgment as to their claim in conversion and breach of statutory warranties. They argue that a jury question exists as to "whether the wrongful debiting of a bank account without the consent nor [sic] knowledge of the owners and holders of said account constitutes tortious conversion." In our view, although plaintiffs, in the depository agreement, gave the Bank their prior consent to exercise a right of setoff, we nevertheless agree that a jury question is presented as to whether the Bank's actions in the case sub judice were timely and in good faith.

"An instrument payable to the order of two or more persons: . . . [i]f not in the alternative is payable to all of them and may be negotiated, discharged, or enforced *only* by all of them." (Emphasis supplied.) OCGA § 11-3-116 (b). "An instrument is converted when: . . . (b) Any person to whom it is delivered for payment refuses on demand either to pay or to return it; or . . . (c) It is paid on a forged endorsement." OCGA § 11-3-419 (1). "Payment of [a] check [or draft] without the endorsement of a joint payee is an exercise of dominion and control over the check [or draft] inconsistent with the nonsigning payee's rights amounting to a conversion. *F.D.I.C. v. Marine Nat. Bank of Jacksonville*, 431 F2d 341 (3-6) (5th Cir. 1970). The situation is analogous to payment of the check [or draft] on a forged endorsement, which Code Ann. § 109A-3-419 (1) (c) [OCGA § 11-3-419 (1) (c)] acknowledges to be a conversion." *Trust Co. of Columbus v. Refrigeration Supplies*, 241 Ga. 406, 408 (246 SE2d 282).

In the case sub judice, there is no evidence that, after a demand by plaintiffs to pay or return the instrument, the Bank refused to return that instrument, i.e., the CNL draft itself. Consequently, the Bank did not wrongfully exercise any dominion over that draft amounting to a conversion under OCGA § 11-3-419 (1) (b). See generally *Bank South, N.A. v. Roswell Jeep Eagle*, 204 Ga. App. 432, 434 (5) (419 SE2d 522). Nor would the Bank's reversal of the transaction amount to an act of dominion inconsistent with the rights of the nonsigning co-payee (Trust Company) as would be a conversion by the Bank, acting in its capacity as the collecting bank. Compare *Trust Co. of Columbus v. Refrigeration Supplies*, 241 Ga. 406, 407, supra. Contrary to plaintiffs' contentions, as depositors, they do not occupy the position of an "other payor" so as to benefit from any warranties

made by a collecting bank to a payor bank or drawee, as imposed by OCGA § 11-4-207 (1) (a). Compare *Ins. Co. of North America v. Atlas Supply Co.*, 121 Ga. App. 1, hn. 2 (172 SE2d 632). Consequently, we agree with the trial court that the acts alleged do not amount to any conversion which is inimical to any property interests of the plaintiff-depositors in the draft.

3. As to the alleged conversion of the funds (versus the draft) subsequently deposited into plaintiffs' checking account, plaintiffs' depository agreement granted the Bank a security interest in all deposits credited to plaintiffs' account and expressly made all deposits provisional. Consequently, the Bank had a contractual right to reverse the transactions by debiting plaintiffs' account and crediting CNL's account in the amount of the draft, upon learning that the draft had not been properly endorsed. *Friedland Properties v. C & S Nat. Bank*, 148 Ga. App. 259, 260 (251 SE2d 143). See also OCGA § 11-4-207 (1). Nevertheless, it is our view that, a jury question remains as to the complete propriety of the Bank's actions in asserting its contractual rights in this particular case.

Generally, the time for a payor Bank to accept and pay, or else to return, a demand item such as the CNL draft in the case sub judice is by "midnight of the banking day of receipt . . ." of the item. OCGA § 11-4-301 (1). The CNL draft, with its patently insufficient endorsement, was accepted for deposit on December 29, 1992. Fully three months later, the Bank "became aware" that the draft it had accepted was insufficiently endorsed, although the record is devoid of specific facts showing how this circumstance was, at last, brought to the Bank's attention. Since the Bank was both the depository-collecting bank *and* the ostensible payor bank, the three-month delay in identifying the inadequate endorsement is attributable to no one but the Bank. "Particularly in the case of a missing endorsement, even a cursory glance at the back of the [draft], by either the bank or the customer, [here CNL as drawer,] would bring the mistake to light." *Trust Co. Bank v. Atlanta IBM Employees Fed. Credit Union*, 245 Ga. 262, 264 (264 SE2d 202). The missing endorsement in the case sub judice was irregular enough on its face to raise some question as to the validity of an endorsement for deposit into the account of one not a payee. Consequently, the Bank had a duty to inquire to ascertain the authority of the depositor-plaintiffs. *Thornton & Co. v. Gwinnett Bank &c. Co.*, 151 Ga. App. 641, 646 (4), 647 (260 SE2d 765). Thus, although the Bank revoked its settlement and charged plaintiffs' account, ostensibly under OCGA § 11-4-212 (3), claiming that plaintiffs breached warranties imposed by OCGA § 11-4-207 (1), the record in the case sub judice does not establish beyond all question that the Bank acted with all commercially reasonable due diligence and dispatch, in *discovering* the irregularity, or that it acted *even-*

*handedly* as between its two customers, plaintiffs on the one hand and CNL on the other, in addressing the error. The Bank's contractual right of setoff must be exercised in good faith. *First Nat. Bank &c. v. Appalachian Indus.*, 146 Ga. App. 630, 634 (4) (247 SE2d 422). Based on the record before us, those questions of diligence, commercial reasonableness, and good faith are for the jury. See, e.g., *Trust Co. of Ga. Bank of Savannah, N.A. v. Port Terminal &c. Co.*, 153 Ga. App. 735, 736 (1), 741 (266 SE2d 254). Consequently, the trial court erred in granting summary judgment as to plaintiffs' claim sounding in wrongful setoff. Any remedy may be limited as justice requires to avoid unjust enrichment. *Woodard v. First Nat. Bank &c.*, 159 Ga. App. 769, 771 (285 SE2d 229).

*Judgment affirmed in part and reversed in part. Johnson and Ruffin, JJ., concur.*

DECIDED AUGUST 15, 1996.

*L. Wayne Gilleland*, for appellants.
*Martin, Snow, Grant & Napier, William K. McGowan, John T. McGoldrick, Jr.*, for appellee.